**Christean M. GRIER, Plaintiff,**

v.

**Albert V. CASEY, in his official capacity as Postmaster General of the United States Postal Service, Defendant.**

**No. C–C–85–0246–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 26, 1986.

As Amended Sept. 10, 1986.

Regan A. Miller, James, McElory & Diehl, Charlotte, N.C., for plaintiff.

Clifford C. Marshall, U.S. Atty., Asheville, N.C., John C. Oldenburg, Sr. Asst. Regional Labor Counsel, Office of Labor Law, Memphis, Tenn., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Chief Judge.

This is an action by the Plaintiff against the United States Postal Service alleging that she was terminated from the Postal Service because of her race (black) and sex (female). She also is claiming sexual harassment.

This Court has jurisdiction under Title 42 U.S.C. § 2000e–16.

The action came on to be heard before the undersigned sitting without a jury on July 22, 23, and 24, 1986 in Charlotte, North Carolina. The Plaintiff was represented by Regan Miller, Attorney at Law and the Defendant was represented by John C. Oldenburg and Ed Lyons, Attorneys at Law.

After hearing the testimony of the witnesses and examining the Exhibits admitted into evidence, the Court will review the evidence and make Findings of Fact.

## REVIEW OF EVIDENCE

1. Plaintiff's employment history after graduating from high school in 1968 was as best as could be determined from her evasive answers:

(a) Wachovia Bank for approximately 1½ years (Plaintiff's Dep. p. 8, lines 6–23). She resigned for personal problems (Plaintiff's Dep. p. 8, line 25).

(b) Consolidated Diesel 1971–1972 (Plaintiff's Dep. p. 11, lines 6–16).

(c) Sealtest 1972–1973 (Plaintiff's Dep. p. 14, lines 2–15).

(d) Northwestern Bank 1974–1976 (Plaintiff's Dep. p. 16, lines 3–18).

(e) First Union Bank 1976–1978 (Plaintiff's Dep. P. 17, line 10). Was told "Leave or you'll be fired". (Plaintiff's Dep. p. 23, Lines 5–6; p. 23, lines 12–25). She was denied unemployment compensation (p. 24, lines 1–24). She also filed a complaint with the EEOC and was given a notice of

right to sue. (Plaintiff's Dep. p. 25, lines 1–14).

(f) Mecklenburg County 1978 (Plaintiff's Dep. p. 28, lines 21–25; and p. 29, line 1). She was terminated because of personality conflicts (Plaintiff's Dep. p. 30, lines 2–21; p. 39, lines 21–25).

(g) Federal Reserve Bank 1979 (Plaintiff's Dep. p. 40, lines 18–24). She was discharged from Federal Reserve for fighting. (Plaintiff's Dep. p. 41, lines 18–25; pp. 42–44 and trial testimony).

2. Her next employment was with the Defendant as a part-time flexible distribution clerk subject to a 90–day probationary period. She was assigned to the third shift of Tour III, with Leroy Galant as her supervisor. In spite of her employment history and having been fired from the previous jobs, she did not answer truthfully the questions on the Defendant's employment application to indicate she had been fired within the past five years. (See Defendant's Exhibit 17, Question 15). This does not help the Plaintiff on the issue of credibility.

3. At end of thirtieth day of probation, Plaintiff received her evaluation, (Plaintiff's Ex. 2A). Out of ten factors in which she received an evaluation there were three unsatisfactory ratings; i.e., general progress in learning the job, productivity, and work habits and attendance. The evaluator's remarks were that she needed to be more prompt, and needed to exercise more care as to her excessive talking. The form was checked to indicate that even though she was not a fully satisfactory employee retention was merited.

4. Plaintiff's sixty day evaluation was satisfactory in all factors except attendance. (Plaintiff's Exhibit 2B). It was still noted that "This employee, although not fully satisfactory at present, merits continued employment."

5. The Plaintiff, by January 27, 1981, had completed her training on the Multi-Position Letter Sorting Machine (MPLSM), which included 47 hours in "keying" the mail. She had also received six hours of training in ledge loading and sweeping. After the training, she was assigned to work on MPSLM's and on a number of occasions was assigned to a "flip crew" which was a crew that moved to different MPSLM's relieving the regular crews who were on break or at lunch. This required her to clock in and out of various operations by using her ID badge in connection with an electronic timekeeping system.

6. After she was assigned to the MPSLM's she failed to use the time clock correctly, was confused as to her assignment, and did not follow the other crew members of the flip crew when she moved from one machine to another, resulting in a disruption to the efficiency of the crew's operation.

7. Plaintiff's Exhibit 11 indicates nine other individuals who were hired approximately the same date as the Plaintiff. Of these there were six white males and three white females. One of the white females (Evans) resigned, and one white male (Collier) was terminated.

8. The Court has examined Plaintiff's Exhibits 3A, B, C; 4A, B, C; 5A, B, C; 6A, B, C; 7A, B, C; 8A, B, C; 9A, B, C; 10A, B, C, with reference to the evaluation of Payne through Collier as shown on Plaintiff's Exhibit 11.

9. *George Payne's Evaluation* (white male) was not remarkable. On his 30–day evaluation, (Exhibit 3A) he was told to cut down on talking, and it was noted that he was not fully satisfactory but merited retention. (Same as Plaintiff).

On his 60–day evaluation (Plaintiff's Ex. 3B) is was noted that he had not qualified on LSM in allotted time, and though not fully satisfactory merited retention (Same as Plaintiff.) On his 80–day evaluation he had no unsatisfactory factors and was found to be a satisfactory employee (as opposed to Grier).

10. *James Cobb's Evaluation* (white male) Plaintiff's Exhibits 4A, and B, 4C. His 30 day evaluation was very poor. He was unsatisfactory in six factors, was found to have no initiative, had not pro-

gressed, had a very unconcerned attitude, had been out twice and had not grasped things as he should have. He was found to be not fully satisfactory but merits continued employment (same as Plaintiff). He was told that if his performance, attitude and overall outlook did not improve in next thirty days he would be terminated.

On his sixty day evaluation Cobb made a complete turnaround. He had no unsatisfactory factors, was found to be satisfactory and was recommended for retention. Cobb's 80–day evaluation was similarly good.

11. *William Barker's Evaluation* (white male) Plaintiff's Exhibits 5A, 5B, 5C. His 30–day evaluation showed no unsatisfactory factors and he was found to be a satisfactory employee and retention was recommended. However, his 60–day evaluation showed he had not qualified on the LSM, was found to be a not fully satisfactory employee, but merited continued employment. His 80–day evaluation indicated all factors to be satisfactory.

12. *Terry Hartley's Evaluation* (white male) Plaintiff's Exhibits 6A, 6B, 6C. His 30–day evaluation indicated one unsatisfactory factor in that he needed to gain a more positive attitude about USPS. He was found to be an unsatisfactory employee, but merited retention (same as Plaintiff).

Hartley's 60–day evaluation had one unsatisfactory factor—he talked too much at case. Again he was found to be not fully satisfactory but merited retention (same as Plaintiff). His 80–day evaluation indicated no unsatisfactory factors and he was found to be a satisfactory employee who merited retention.

Hartley was warned that if he failed to meet the requirements of PTF Distribution Clerk, he would be terminated. (Plaintiff's Exhibit 6E).

13. *Sheila Broadway's (Ivester) Evaluation* (white female) Plaintiff's Exhibits 7A, 7B, 7C. Her 30–day evaluation had one unsatisfactory factor—she talked too much. She was found to be not fully satis-

factory, but merited retention (same as Plaintiff). Her 60–day evaluation contained no unsatisfactory factors, and she was found to be a satisfactory employee whose retention was recommended. Her 80–day evaluation included one unsatisfactory factor—she had been out. She was informed that absenteeism would not be tolerated and Galant indicated that "she has taken what I've said in the proper perspective and will not cause us problems in this regard later." She was found to be not fully satisfactory but merited continued employment.

14. *Tamara Lipe* (white female) Plaintiff's Exhibit 8A, 8B, 8C. All factors on Ms. Lipe's Evaluation were satisfactory on the 30, 60, and 80–day evaluations. She was also found to be a satisfactory employee with retention recommended on all evaluations.

15. *William Helms* (white male) Plaintiff's Exhibits 9A, 9B, and 9C. Helms' 30–day evaluation showed all factors to be satisfactory. He was found to be satisfactory and retention was recommended. His 60–day evaluation contained one unsatisfactory factor—he was not qualified on the LSM in the allotted time and was informed that if he did not qualify during his 80–day probation, he would be terminated.

He was found not fully satisfactory at that time, but merited continued employment (same as Plaintiff).

His 80–day evaluation indicated all factors satisfactory and was found to be satisfactory at that time and retention was recommended.

16. *Thomas Collier* (white male) Plaintiff's Exhibit 10A, 10B, 10C.

His 30–day evaluation showed two unsatisfactory factors; *i.e.,* his productivity and work habits and his attendance—punctuality and reliability. The comments were that he needed to be more consistent—at times okay, other times appears disorganized—needed to make sure of reporting time and to report as scheduled.

He was found not fully satisfactory, but merited continued employment.

His 60–day evaluation showed one unsatisfactory factor in that he had not qualified in allowed time. He was found to be not fully satisfactory, but merited continued employment.

His 80–day evaluation showed one unsatisfactory factor. He had not qualified on LSM. He was found to be an unsatisfactory employee and should be separated for failure to qualify. He was terminated on March 11, 1981.

17. The Plaintiff's 80–day evaluation (Plaintiff's Exhibit 2C) indicated seven unsatisfactory factors compared with three on her 30–day evaluation (Plaintiff's Exhibit 2A) and one on her 60–day evaluation.

Her 90–day evaluation indicated:

(a) Had numerous problems in LSM operations.

(b) Too much wasted motion.

(c) Poor attitude—walked away from one supervisor.

(d) Has trouble relating to instructions.

(e) Does not always strive for thoroughness.

(f) Unwillingness to handle all assignments—had indicated on at least one occasion she did not want to key.

(g) Unsatisfactory attendance and punctuality. Has made several early and late rings on the clock.

18. The other comments were that she appeared confused quite a bit, that when a supervisor was talking to her she should show him the respect and courtesy he is due. She was told to read and follow instructions fully, that when asked to do something she should do it fully, that when she was assigned somewhere it was for a reason and that she should go as instructed.

19. She was further told on February 26 her reporting time would be 1600 on February 27, that all PTF's were told same thing, and that all reported with the exception of the Plaintiff. Her excuse was that "the man" told her 1700 although she could not identify "the man."

20. She was found to be an unsatisfactory employee and should be separated for failure to qualify. Comparing the Plaintiff's evaluation with those of the other employees does not indicate that she was treated any differently from the employees whose evaluations were Plaintiff's Exhibits. Any employee who received even one unsatisfactory factor on the evaluations was found to be not fully satisfactory.

21. None of Plaintiff's Exhibits 2A through 10C indicate that the Plaintiff was treated any differently than the other employees whose evaluations were included in Plaintiff's exhibits.

22. If those evaluations indicate anything, it is that the Plaintiff had the ability and intelligence to perform her duties, but had the attitude that since she was a black female she could not be discharged, even if untruthful, unreliable, belligerent, and unwilling to accept the criticism of her supervisors and then make an effort to correct her deficiencies.

23. The testimony of two witnesses illustrated this attitude.

a. *Mitchell Carmichael* is an LSM operator—has been for 13 years. He recalled that one night more than two or three years prior to the trial he was working with the Plaintiff on the back side of an LSM. He testified she seemed a little mad about something. Her duties were to load ledges 1, 2, 3, pull the 0/400 bin and work in the first module area of her section on the back half of the machine. The first module area started running over with mail. The Plaintiff came around on the back half of the machine and she pulled maybe one or two hand fulls out of the machine got mad and said: "Does [sic] those mothers fuckers expect me to pull the mail in the back half of this damn machine, go around, pull the 0/400 bin, load the ledges, and still stay caught up? If they do expect it, the mother fuckers can kiss my ass." Carmichael merely commented to her "Everybody else does it."

Carmichael testified that his supervisor Charlie Gayle came to the back half of the machine and asked what the trouble was and Carmichael told him what had happened. He (Gayle) said he would handle it.

(b) *Charlie Gayle* testified that he was the LSM supervisor while Plaintiff was employed at the postal facility and that on the night of the incident he was supervising LSM No. 1 and was coming around the machine where some bells were ringing indicating there was an overflow. He asked Carmichael, who was working the machine, what the problem was. Carmichael answered that he was not getting any help from the lady that's supposed to be around here helping, and that she just came around cussing. Gayle went around the machine and Grier was standing beside Consoles 1 and 2 looking back at the 0/400 mail that was falling out onto the floor and not making any effort to load the three ledges she was assigned to. He called the Plaintiff over to where he was standing and asked her what the problem was. She answered in an arrogant manner "Nothing!" Gayle told her: "you're letting the mail run out of the machines, the three ledges you're supposed to be loading, you're not dipping the 0 bins in the 400 bins to keep them from falling out onto the floor, and you're not helping around back." She turned around real hastily like she was going to walk off. He told her he was not through talking to her and that this was an official discussion for failure to operate her manual duties and to go to the 030 operations. Gayle further testified that no buzzers went off, and in fact no buzzer was used to notify employees of break time.

Gayle further testified that he met with Ms. Grier and Mr. Galant and that in response to Galant's question about his problem with Ms. Grier he told Galant that he had given Plaintiff a discussion for failing to perform her duties and her attitude that she was not receptive or cooperative with what he was trying to convey. He further testified that he did not laugh.

Gayle further testified that about a week later that he was standing at the end of the machine talking to the superintendent, Mr. Dean Chesser, when Plaintiff walked up and said Charlie Gayle, you used a g.d. lie on me, and then started cussing Gayle and Chesser. Gayle asked Chesser if they had to stand there and take a cussing from Ms. Grier and Chesser responded they did not and told the Plaintiff to leave the building. He and Chesser and Grier walked away and Grier continued cussing Chesser.

24. In Plaintiff's proposed findings of fact No. 10 she states:

In comparison James Cobb (white male) receives six unsatisfactory ratings out of 10 categories. Most significantly, Galant criticized Cobb about his attitude towards his work and his ability to understand and follow instructions. Despite these unsatisfactory ratings, Cobb was retained and given an opportunity to improve his job performance.

25. What the Plaintiff fails to state is that these six unsatisfactory ratings were the 30–day evaluation for Cobb, and that on his 60 and 80 day evaluations Cobb (Plaintiff's Exhibits 4B and 4C) had *not one* unsatisfactory rating. He had accepted the supervisor's criticism and corrected his deficiencies.

26. Plaintiff's proposed findings of Fact No. 13 is to the effect that Sheila Broadway (Ivester) complained to Galant in a belligerent tone about not being informed of a scheduled change, that Galant pulled her aside and criticized her for the tone of voice she used and she was allowed to apologize.

27. Plaintiff's testimony in support of this finding was that Broadway (Ivester) was told by Galant that since she was late one day that she would have to stay another hour and that Broadway responded:

"Something is wrong here—this damn place sucks."

28. Galant testified he did not remember Broadway's behavior being bad. Broadway testified she did not remember using bad language, but may have referred to "this damn place," and that she apologized. Even if Plaintiff's testimony is true, which this Court does not believe, it did not approach the tirade of Plaintiff cursing her supervisors.

29. Plaintiff's proposed finding of Fact No. 14 was that

14. On a prior occasion, Terry Harley (white male) had used profanity in expressing his unwillingness to work overtime hours which had been required by Galant. Hartley received an oral discussion with Galant about his attitudes [sic] toward accepting such job assignments.

30. The only evidence offered by Plaintiff to support this finding of fact was the cross examination of Galant by the Defendant. Galant testified that Hartley said on one occasion: "I'm tired of making damn overtime. I'll quit." On the other hand, Galant testified that Grier had said "I've worked my tail off in this agency. You bastards don't appreciate it. You fuckers will pay for this." The statement was made in the presence of 35 to 40 other employees.

31. The Plaintiff took the stand and offered testimony in an attempt to support her claim. The Court observed the Plaintiff's demeanor on the stand, and noted the evasive way she answered questions propounded to her and the many contradictions between her testimony and other credible evidence.

32. The Plaintiff testified in substance

(a) She was never told to check chalk board to determine what time to report on her next shift. On the other hand, Plaintiff's witness Broadway (Ivester) testified group of PTF's were shown the chalk board and told to check it daily before leaving to determine when to report next day. Similarly, Tamara Lipe Barringer, (white female) Rosa Spencer (black female), Rosetta Cloud (black female), all *Plaintiff's* witnesses, testified that they were told to check chalk board to determine time to report.

(b) That on February 26, 1981 she went to back of LSM to pull mail and went to tell Gayle she needed help that Gayle talked to her a few minutes, that she thought he was through, that the bell rang for break, that she walked away and that Gayle called her back and accused her of walking away. This testimony is disputed by Mitchell Carmichael, another Postal employee, and by Charles Gayle as previously set out.

(c) When she came in the next day she wanted to see Galant and he told her to see Chesser. She said she wanted to see Chesser. Galant came later and told her to go to clerk's office. She went in and Chesser told her to have a seat. Plaintiff testified the room was approximately 12 X 12 feet with two desks and a filing cabinet and she did not see anyone else in the office. She asked Chesser what she had done wrong and that she did not want to be terminated. She testified Chesser said "Are you going to cooperate with me" and reached for her leg. She told him "No" and then he slapped his knees and said "Okay, that's it. Go home, you're not going to work out." This testimony is disputed by Dean Chesser. After Galant had told him that Plaintiff wanted a conference with him Chesser testified that he called her into the office, that he had asked Jennings Watson, general clerk to be in the office and he was present during Chesser's conversation with Plaintiff. Chesser testified that Plaintiff seated herself four or five feet away and stated she wanted to discuss her evaluation. He testified that he listened and told Plaintiff he was afraid he concurred with Galant as to her evaluation, and

would not change it. Plaintiff then got up and told Chesser: "You are a fucking son of a bitch." Chesser testified that he did not state to her that she was not cooperating, did not attempt to touch her leg, did not slap his hands on his legs and tell her she was fired and did not imply any sexual favors. Jennings Watson corroborated Chesser's testimony and testified that the office was 14 X 26 feet with a door at the front, that his desk was on left side of room midway of it, that he had a complete view of Chesser and the Plaintiff, and that Chesser did not obstruct his view. He testified that Chesser did *not* tell Plaintiff she would not cooperate with him, made no mention of her looks, made no statement that if you do something for me, I'll save your job, and did not slap his hands and say "you're fired." He testified that at the conclusion of the conversation the Plaintiff grabbed her purse and said: "You god damned mother fucking son of a bitch, you all discriminate against blacks."

33. This incredible testimony by the Plaintiff is made even more incredible by her following testimony.

34. Ms. Grier then testified that after her termination she took an EEO complaint to Alston Bellamy, (black male), an EEO counselor at the Post Office. She had never met Bellamy before, but she testified he tried to kiss her and said "you will be mine." She testified he tried to unbutton her blouse and hugged her. She further testified that Bellamy led her to believe that if she responded to his sexual advances she could stay in her job. She testified that Bellamy told her she should not pursue sexual harassment beyond his level.

35. The Plaintiff then testified that when she was fired that she told her father and he called James Toatley, a neighbor and a retired EEO specialist at the Post Office, to see if he could do anything. Toatley (a black male), according to the Plaintiff, came over to her house and asked her to go to the beach with him.

36. She testified her case was investigated by Warner Shelton (a black male), a Postal EEO counselor who was a Regional Director or Representative, Plaintiff testified that Shelton told her that the woman he went with had access to his checkbook and that he was offering the Plaintiff the privilege of using his checkbook. Plaintiff further testified that Shelton did not make an outright sexual advance, but he was approaching her being a little flip.

37. Alston Bellamy testified that he had never met the Plaintiff before she came to see him, that she never mentioned any sexual advances by Chesser, that he never said Chesser was known as a lover out there, that he never attempted to kiss her, that he never attempted to unfasten her articles of clothing, that he never told her he could save her employment if she would respond to him in a sexual fashion, and finally that he not tell her he controlled Chesser.

38. James Toatley, the neighbor called by the Plaintiff's father, testified that Plaintiff never told him that Chesser had made sexual advances to her, nor that Chesser had ever mentioned her cooperating with him. He testified that Plaintiff had never said anything about sexual harassment by either Bellamy or Chesser. Toatley further testified that he had never asked Plaintiff to accompany him to the beach or anywhere else.

39. Warner Shelton testified he met with Plaintiff because of her filing a formal complaint. He testified he did not recall Plaintiff ever mentioning any claim of sexual harassment against Chesser, Bellamy, or Toatley, and that if any such allegation had been made he would have called the southern regional office which would have assigned a team to investigate the claim. He further testified that he never offered Plaintiff the use of his checkbook, nor did he make any sexual advancement to her.

40. So, even though the Plaintiff never mentioned sexual harassment to her counselors, (*See* Page 178 Lines 15 through 25 and Page 179, Line 1 of her deposition)

(Government Exhibit 4), she testified that sexual harassment was the most important of her three claims of race discrimination, sex discrimination and sexual harassment.

## FINDINGS OF FACT

1. The Plaintiff, a black female was hired on December 13, 1980 at the Charlotte, North Carolina General Mail Facility of the United States Postal Service as a part-time flexible (PTF) worker to operate the Multiple Position Letter Sorting Machine (MPLSM). The PTFs are hired for a 90–day probationary period during which they receive training including manual letter sorting. The Plaintiff was assigned to third shift, Tour III.

2. At the time the Plaintiff was hired, she along with the others in her group who were hired at the same time, were placed under the supervision of Leroy Galant who was the acting Supervisor of Mails at the facility, and as such had the responsibility of evaluating the PTFs, including the Plaintiff, on the 30th, 60th, and 80th day of their employment.

3. The new employees received their orientation from Postal Employees Development Center (PEDC).

4. Galant's function was to inform the new employees of their duty to be punctual and reliable, and to complete the evaluations. He also instructed them on the use of their ID badge in connection with an electronic time keeping system and the importance of checking the chalk board before leaving work to determine when to return.

5. Dean Chesser was Galant's immediate supervisor, but did not give Galant any formal training to Galant as to EEO requirements or how to evaluate employees.

6. The PTFs were evaluated every 30th, 60th, and 80th day after their employment.

7. Plaintiff was one of ten employees hired from November 29, 1980. There were six white males and three white females, and the Plaintiff, a black female in the group. (See Plaintiff's Exhibit 11).

8. When applicants are hired by the Defendant, they are required to complete a written application, P.S. Form 2591 (Defendant's Exhibit 17). Question 15 on that form states: "Within the last five years have you been fired from any job for any reason?" There is provided a space for the applicant to check "yes" or "no". The Plaintiff checked "no."

9. There is a space on the next page, paragraph 22 for detailed answers. This was left blank by the Plaintiff who signed the application on February 17, 1979, certifying all answers to be true and correct.

Above the signature appeared the standard clause:

A false or dishonest answer to any question in this statement may be grounds for not employing you or for dismissing you after you begin work, and you may be punishable by fine or imprisonment. (U.S. Code, Title 18, Section 1001). All information you give will be considered in reviewing your statement and is subject to investigation.

10. The Plaintiff's answer to Question 15 on the application was false in that she had been fired from First Union National Bank, Mecklenburg County and the Federal Reserve Bank within the previous five years.

11. Of the group of PTFs who were hired at approximately the same time as Plaintiff, Thomas Collier, a white male, was fired because his 80–day evaluation showed he had not qualified on the LSM. The white female, Evans, resigned.

12. The 80–day evaluation of the remaining PTF's five white males had no unsatisfactory factors on their 80 day evaluations. Of the two white females one had all satisfactory factors on their 80–day evaluation. The other, Broadway (Ivester), had one unsatisfactory factor, attendance, and was warned that absenteeism would not be tolerated.

13. The Plaintiff's 80–day evaluation indicated seven unsatisfactory factors, out of ten.

14. The Court finds as a fact based on the credible testimony and the exhibits admitted at trial that the unsatisfactory factors on Plaintiff's 80–day evaluation were justified, and that Plaintiff was not treated any differently by her supervisors than were the other PTF's, male and female who were hired as shown on Plaintiff's Exhibit 11.

15. As to her claim of sexual harassment, the claim was never raised before she reached the hearing before the EEOC, Plaintiff's Exhibit 26.

16. The Court finds Plaintiff's testimony that sexual advances were made to her by Chesser, Bellamy, Toatley, a neighbor, and Shelton to be totally unbelievable, and an obvious fabrication by the Plaintiff, if not caused by hallucination.

17. As to her claims that she was not the only employee who cursed, she produced credible testimony that Terry Hartley had used the word "damn" in referring to the Post Office, for which he was reprimanded. She also produced credible testimony that Sheila Broadway (Ivester) may have referred to this "damm place," for which Gallant called her over and told her to calm down and for which she apologized.

18. The Court finds as a fact that neither of these instances reaches the level of tirade of cursing directed to her supervisors by the Plaintiff.

19. The Court further finds as a fact that all employees shown on Plaintiff's Exhibit 11, white, black, male, and female were given assignments they would rather not perform, but they did, except for the Plaintiff who took the attitude " ... the mother fuckers can kiss my ass."

20. The Court further finds that all PTF's including the Plaintiff, were advised to check the "chalk board" before leaving to determine what time to return to their next duty. All did, except Plaintiff who was late, on at least one occasion.

21. (a) The Court finds as a fact that none of the employees challenged the authority of their supervisors except the Plaintiff.

(b) The Court finds as a fact that all of the employees who were hired at about the same time as Plaintiff, as shown on her Exhibit 11, were given the same training and all performed their duties satisfactorily except the Plaintiff and Collier (white male) who was terminated and Evans (white female) who resigned.

22. The Court finds that all PTF's accepted correction and criticism, except the Plaintiff.

23. In summary, the Court finds from this testimony and the exhibits that have been admitted that the Plaintiff is a person totally unworthy of belief who has brought charges of discrimination because of race and sex because being a black female she does not believe she should be discharged for failure to perform her duties properly, and for being unreliable and unproductive. She also apparently believes she should be allowed to use abusive language to her supervisors and challenge this authority because she is black and female. The Court finds that her verbal tirades directed at her supervisors, especially in front of other employees, is inexcusable, and conduct which cannot be condoned if the postal facility is to function.

24. Finally, the Plaintiff's attack on the reputations of Chesser, Bellamy, Toatley, and Shelton in an apparent attempt to "win at any cost" is some of the most outrageous conduct this Court has witnessed.

## CONCLUSIONS OF LAW

(1) This action was instituted by the Plaintiff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

(2) The Court has jurisdiction over this litigation pursuant to Title 42 U.S.C. § 2000e–16.

(3) Title VII (42 U.S.C. § 2000e–2(a)(1)) provides in pertinent part:

(a) Employers. It shall be an unlawful employment practice for an employer— ... to discharge any individual ... *because* (emphasis added) of such individual's race, ... sex....

(4) It is noted that the law does not read that a person may not be discharged *if* she is black or *if* she is female. Accordingly, under this law the burden remains with the Plaintiff to prove by a preponderance of the evidence that she was discriminated against *because* she was black, and/or because she is a female. *See e.g., Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

(5) The Plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 793, 802, 93 S.Ct. 1817, 1820, 1824, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case, the Plaintiff must prove:

> actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act."

*Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); see also, *Texas Department of Community Affairs v. Burdine, supra; McDonnell Douglas Corp. v. Green, supra.*

(6) If the Plaintiff succeeds in proving a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the challenged action. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. This burden is merely a burden of production of evidence and the burden of persuasion does not shift to the Defendant. *Id.* at 256–57, 101 S.Ct. at 1095–96. If the Defendant carries this burden of production, the Plaintiff must then prove by a preponderance of the evidence that the proffered reasons were not the true reasons for the employer's decision, but rather were a pretext for discrimination. *Id.* The burden of showing that the reasons articulated by the Defendant are pretextual merges with the Plaintiff's ultimate burden of persuading the Court that he was the victim of racial discrimination. *Id.*

(7) In Title VII cases, such as the instant action, in which disparate treatment is the basis of the Plaintiff's claims, the Plaintiff must prove intentional discrimination. It must be shown by the Plaintiff that the action by the employer was taken because of the employee's race and/or sex. The intent of the employer must be to discharge an employee because this employee is black or female. The employer's intent or motivation may be shown by inferences rather than direct evidence of intentional discrimination, but the evidence, whether direct, circumstantial, or otherwise must establish by a preponderance of the evidence the discriminatory intent and not simply that the employee was a member of a protected class. *Texas Department of Community Affairs v. Burdine, supra; Board of Trustees of Keene State College v. Sweeney, supra; Marquis v. Omaha District Sales Office,* 440 F.2d 1157 (8th Cir.1971); *Blue Bell Boots, Inc. v. EEOC,* 418 F.2d 355 (6th Cir.1969).

(8) The Plaintiff cannot prove that the employer's reason for his discharge was pretextual merely by claiming that the employer's action was mistaken. The law is clear that an employer's reason for his action may be a good reason, a bad reason, a mistaken reason, or no reason at all, as long as the decision was not based on race and/or sex or other unlawful discriminatory criteria. *Sanchez v. Texas Commission on Alcoholism,* 660 F.2d 658, 662 (5th Cir. 1981); *Jefferies v. Harris County Community Action Association,* 615 F.2d 1025, 1036 (5th Cir.1980); *Corley v. Jackson Police Department,* 566 F.2d 994, 1003 n. 14 (5th Cir.1978); *Silberhorn v. General Iron Works Co.,* 584 F.2d 970, 972 (10th Cir. 1978); *Tims v. Board of Education,* 452

F.2d 551 (8th Cir.1971). An employer is not required to prove that its decision was correct; the trier of fact need only determine that the defendant, in good faith believed the plaintiff's performance to be unsatisfactory and that the asserted reason for the action was not a mere pretext for discrimination. *Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982); *Jones v. Los Angeles Community College District,* 702 F.2d 203, 205 (9th Cir.1983).

■ (9) The decision as to what criteria shall be considered in making employment decisions lies fully in the hands of the employer, as long as discriminatory criteria are not applied. *Bay v. Goodyear Tire Rubber Co.,* 23 Empl.Prac.Dec. (CCH) ¶ 30, 903 at p. 15673 (S.D.Tex.1980), *aff'd mem.* 638 F.2d 1233 (5th Cir.1981), *cert. denied,* 454 U.S. 862, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981).

(10) A plaintiff's general assertion that he was discriminated against is insufficient as a matter of law to show that the stated reason for the action is a pretext. *Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators,* 563 F.2d 205 (5th Cir. 1977); *Patterson v. General Motors Corp.,* 631 F.2d 476 (7th Cir.1980). Also a plaintiff cannot rebut the stated reason for his discharge merely by showing that he (1) meets the minimum qualifications for the job, (2) was hired, and (3) believes he performed satisfactorily. *Smith v. Flax,* 618 F.2d 1062 (4th Cir.1980); *Jackson v. City of Killeen,* 654 F.2d 1181 (5th Cir.1981); *Patmon v. Van Dorn Co.,* 498 F.2d 544 (6th Cir.1974).

■ In light of the above principles and after weighing the evidence the Court concludes that the Plaintiff has failed to prove by a preponderance of the evidence that the Defendant's decision to terminate Plaintiff was because of her race or sex.

The Plaintiff had been fired from three jobs within five years prior to the time that she completed her application for employment with the Defendant. Yet she deliberately denied any discharge within that five years period. Integrity, honesty, and a concerted effort in one's duties are legitimate qualifications to demand of any employer in any position, whether a corporate President or a postal clerk. The Plaintiff does not have those qualifications.

■ The Plaintiff has from the time she falsified her application not been honest with her employer, nor has she been honest with this Court. As to her work performance, the Court recognizes that if the employee's diminished work performance is caused by the employer's discrimination, then the employer cannot rely on diminished work performance as a nondiscriminatory reason for disciplinary action. *See e.g., Degrace v. Rumsfeld,* 614 F.2d 796, 803–04 (1st Cir.1980).

The evidence here is that Plaintiff was hired with a group of white males and females, and had the same problems the others did. However, the other employees hired with her, who had the same instruction, performed their jobs, were reliable, and took correction and criticism without a cursing tirade directed at their supervisor.

The Plaintiff has produced no credible evidence that she received any different or less instruction than the other employee who was hired at the same time that she was. She has not shown by other than "her feeling" that she was singled out and not told how to perform her duties.

In summary, after considering all the evidence arguably relevant to the claim of discrimination, the Court finds that the Plaintiff has failed to demonstrate the Defendant's reasons for its employment action as to the Plaintiff were pretextual, and were not taken in good faith. The credible evidence does not show that the Defendant permitted any non-black or male employee to engage in conduct similar to the Plaintiff's or that any similarly situated non-black or male employee was subject to different terms and conditions of employment.

Based on the evidence the Court concludes that the Defendant did not discrimi-

nate as alleged against the Plaintiff on account of sex or race.

As to the Plaintiff's claim of sexual harassment,

> Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshness of racial epithets.

*Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982). cited in *Meritor Savings Bank v. Vinson,* —— U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

██ However, the Court simply does not believe the Plaintiff's testimony, unsupported by any corroborating evidence, that sexual advances were made to her by Superintendent Chesser, by EEOC Counselor Bellamy, by her neighbor, Toatley, and by EEOC Investigator Shelton. This testimony by the Plaintiff is the result either of her illusions or intentional untruth in an attempt to win at any cost, even if reputations of persons she came in contact with may be damaged in the process.

Any finding of fact which is determined also to be a conclusion of law is so deemed and any conclusion of law which is determined also to be a finding of fact is so deemed.

Each party shall bear her and its costs, including attorney's fees, in this litigation.

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS, HEREBY, ORDERED, ADJUDGED, AND DECREED:

(1) That the Plaintiff's claims of discrimination are DISMISSED WITH PREJUDICE; and

(2) Judgment will be entered in accordance with this Order by the Clerk.