**Becky Hope KELSO, Plaintiff,**

v.

**HOMELITE, A DIVISION OF TEXTRON, INC., a Delaware Corporation, Defendant.**

**No. C–C–86–348–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

June 1, 1987.

As Amended June 12, 1987.

Lloyd T. Kelso, Kelso & Ferguson, Gastonia, N.C., for plaintiff.

Stephen M.S. Courtland, William C. Livingston, Charlotte, N.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT D. POTTER, Chief Judge.

THIS MATTER was tried before the undersigned without a jury on May 14, 1987 at Charlotte, North Carolina. The Plaintiff was represented by John W. Gresham, Esquire, and the Defendant was represented by Stephen M.S. Courtland and William C. Livingston, Attorneys at Law.

### FINDINGS OF FACT

(1) Plaintiff, Becky Hope Kelso, is a female employee of Defendant.

(2) The Court has jurisdiction of this case under the provisions of Title 42, U.S.C. § 2000e–5(f)(3).

(3) The Plaintiff is a resident of Gaston County, North Carolina, in the Western District of North Carolina.

(4) Defendant was an employer as defined in Section 701(b) of Title VII.

(5) The Plaintiff was employed by the Defendant from October 19, 1959 through January 6, 1961, and from May 26, 1961 through the present time, and has worked throughout her employment with the Defendant at its Gaston County, North Carolina, facility.

(6) From the fall of 1975 through March 31, 1985 the Plaintiff was employed by the Defendant as a tool grinder, when she was transferred to the position of miscellaneous machine operator A, level 3.

(7) As a tool grinder, the Plaintiff's duties were to re-sharpen and make cutting tools.

(8) When the Plaintiff began her employment as a tool grinder a Mr. Howard Andrews was the tool room supervisor with supervisory duties over the tool room.

(9) When the Plaintiff first entered her duties as a tool grinder she was the only female tool grinder.

(10) Later Mr. Andrews moved to engineering and Gaza Farcus became the tool room supervisor.

(11) During Farcus' tenure, two more females were brought into the tool room as tool grinders.

(12) Buddy Fletcher became tool room supervisor when Farcus left the position.

(13) Buddy Fletcher was tool room supervisor until he retired in May of 1986.

(14) The Plaintiff testified that she had been told by Roger Black, the "lead man" in the tool room, that Buddy Fletcher had made numerous remarks to the effect that he did not want women in the tool room, and that there would not be any more women in the tool room. However, the Plaintiff never heard Fletcher make any of these remarks to Black, and Black was not called as a witness by the Plaintiff even though he was subject to subpoena and available. This hearsay testimony will not be considered by the Court.

(15) A tool maker is a much more complex job than a tool grinder. A tool maker must be able to read blueprints and operate a greater variety of machines, and requires about four years training before certification. Whereas, a tool grinder grinds tools. (See Plaintiff's Exhibit 39, pp. 10–13).

(16) The Plaintiff testified that women were treated by Fletcher differently than men, but that she never complained to anyone in management about Fletcher's treatment of her.

(17) In March of 1985 because of a drastic reduction in sales, there was a reduction in the Defendant's workforce nationwide from approximately 4,000 employees in 1980 to 1,500 in 1985. In the Gastonia facility there was a reduction of employees from approximately 1,450 in 1980 to approximately 700 in 1985. There were approximately 150 positions eliminated in March—April 1985. In March of 1985 there were two reductions in the number of tool grinders at the Gastonia facility. In early March one man (Orvis Riley) and one woman (Phoebe Summit) tool grinder were eliminated. In late March, the remaining two tool grinder positions were eliminated, one man (William Costner) and the Plaintiff were transferred from the tool room. That left no tool grinders in the Gastonia facility, and none of the tool grinder jobs have been filled. One toolmaker position has also been eliminated since April 1985.

(18) Tool makers could perform the less complicated job of tool grinder, but a tool grinder could not perform the task of tool maker. (See Plaintiff's Exhibit 39, pp. 10–14).

(19) The articulated reason by the Defendant for eliminating the jobs of tool grinder, rather than the jobs of tool makers was that certified tool makers were difficult to locate, and expensive to train, whereas a tool grinder could be trained in less time. (See Plaintiff's Exhibit 39, p. 13). This evidence is very credible. The Plaintiff made a great deal about the fact that tool makers were paid higher than tool grinders and therefore that it would have cost the company less to retain the tool grinders and lay off the tool makers. However, the Plaintiff overlooks the fact that it would clearly be more cost effective to retain the highly trained tool makers than the tool grinders, because at such time as the company's business did increase these tool makers would be available to provide the necessary production, and in the meantime, they would be able to perform the tool grinders' functions, as needed. This is clearly a business decision and could not be construed to be pretextual. It simply defies all reason and common sense to contend that when business projections dictate a reduction in force that the more highly trained employees were retained by the company just to satisfy some imagined motive by the Defendant to discriminate against the female tool grinders.

(20) The Plaintiff testified that the tool room supervisor, Buddy Fletcher, told her in 1979 that he did not believe women should be in the tool room. This is the only competent evidence the Court can consider of any remarks made by Fletcher to Plaintiff indicating any bias against women.

This is certainly not sufficient to support Plaintiff's contention of discrimination. Fletcher, in his testimony, denied having made such a remark in 1979. The Plaintiff, however, never complained to management about Fletcher's remarks or about her feeling that he discriminated against women. In July, 1984, the same Buddy Fletcher signed a performance review for the Plaintiff giving her exceptional, commendable, superior, above average rating in various categories of her performance and an excellent overall rating. See *Plaintiff's* Exhibit 22. It is incredulous to contend that Fletcher demonstrated bias against women because of an alleged remark in 1979 and then that he would give such an excellent rating to the female Plaintiff in 1984.

(21) Phoebe Summitt, female, testified for the *Plaintiff* that Roger Black had told her that Fletcher didn't like women in the tool room. However, she never heard Fletcher say that, and *she* did *not* feel that she was treated any differently than any male tool grinder and she had no complaint about unfair treatment even though she was also transferred from the tool room in the reduction of force. The Court simply does not believe that the hearsay testimony of Roger Black is credible. It was allowed in for the record, but the Court does not find it admissible or credible.

(22) One Sherry Atkinson testified for the Plaintiff that Fletcher treated her differently than he did men when she worked in the tool room—that she had to do her own lifting—that Fletcher told her she would never move up to tool maker—that Fletcher wanted her located where he could watch her work—that Fletcher told her she was the only one getting help, even though one of the males was getting help. She is no longer with the Defendant, having left voluntarily for another job. Fletcher denied all these allegations by Atkinson. He testified that he did not tell Atkinson that if she wanted to do a man's work she would have to do the lifting, or make any of the other remarks attributed to him by Atkinson. Having observed Atkinson testify, as well as Fletcher, the Court does not find the testimony of Atkinson to be credible, versus that of Fletcher, who is now retired. The Court has the impression that Atkinson has ill will toward Defendant, and finds that her testimony was affected by her animosity toward Defendant.

(23) The Plaintiff made much ado about the fact that in Plaintiff's Exhibit 39, pp. 13–15, the Defendant in responding to the EEOC the Defendant on pp. 13 and 14 stated:

> Presented with this decision in early March of 1985, Mr. Fletcher carefully considered the duties of tool room positions and the present and anticipated needs of Homelite and concluded that the elimination of two of the four tool grinder positions was in the best interest of Homelite.
>
> . . . .
>
> Mr. Fletcher was unfortunately again faced with the same question later that month—that is, the elimination of two main positions. Here too Mr. Fletcher carefully considered this and again determined that the elimination of the two remaining tool grinder positions was in the best interest of Homelite. . . .

The Plaintiff emphasizes the semantics of the words that Fletcher was the person who concluded who would be transferred. However, there was ample credible testimony by the Defendant that it was not Fletcher who made the decisions on transfers, or hiring and firing. The testimony was, and the Court finds as a fact that the plant manager, Thomas Brosnahan, made the initial decision to reduce the work force at the Gastonia facility and gave that directive to the various department heads because of projections of reduced sales. Once the decision to reduce the number of employees was made by the plant manager, he then called a meeting of the head of Manufacturing Engineering, Accounting, Quality Control Production Control, and Personnel Manager. Each division or department head would then be informed how many positions would be eliminated. The personnel manager would take the total numbers and select those with special skills and make up a proposal for as to what position would be terminated. He would propose a layoff meeting five days before layoff.

Then he would meet with each manager and discuss with them proposals for lay-offs. They would then meet with the plant manager and if he approved the layoffs or transfers, the employees would be notified on a Friday. Supervisors, such as Fletcher, could recommend the layoffs or trans-fers, but they had no authority to make any transfers or layoffs.

In summary,

A. The Plaintiff was a 27–year employee of the Defendant who was a good worker; and so rated by her supervisor, Fletcher.

B. The Defendant's sales declined nationally 250 million dollars in 1980 to approximately 150 million dollars in 1985.

C. The Defendant's employment nationwide in 1980 was approximately 4,000 and declined to 1,500 in 1985.

D. The number of employees at the Gastonia plant where the Plaintiff was employed declined from approximately 1,450 in 1980 to approximately 750 in 1985.

E. The Plaintiff was first employed by the Defendant in October 1959, was laid off in January 1961, and recalled in May 1961, and has been employed there since and is still employed there.

F. The Plaintiff transferred to the tool room as a tool grinder in 1975 or 1976 and remained there until April 1985, when she was transferred out to a drill press machine, with a reduction of $1.00 an hour in pay.

G. In 1979 Buddy Fletcher, the Plaintiff's supervisor, allegedly told Plaintiff that he did not think women ought to be in the department. This is the only credible evidence of any statement by Fletcher, as to women working in the tool room. Any other statements by Fletcher as to women working in the tool room were hearsay statements by Roger Black as to what Fletcher had said and will not be considered by the Court. Roger Black was available but was not called by the Plaintiff as a witness.

H. The chain of command in the Gastonia plant in March of 1985 was from the supervisor, Fletcher, to Tony Greemon, the Manufacturing Engineering Section Manager, to Thomas Ganatsiou, Manager of Manufacturing Engineering, to Thomas Brosnahan, the Plant Manager.

I. As a result of the reduced sales, and the projection of future sales of the company in 1985, the Plant Manager, in late February or early March, 1985, determined a reduction in the number of employees must be carried out. He called a meeting of the department heads, which included the head of Manufacturing Engineering, Accounting, Quality Control, and Production Control and advised them of the necessary number of reductions in jobs. Mr. Ganatsiou, Manager of Manufacturing Engineering, then met with the Personnel Manager, John Lawing, and the Manufacturing Engineering Section Manager, Mr. Greemon, and told them that there would have to be a reduction in the number of employees, and advised them of the number to be reduction in each section and department, including the tool room which included tool makers and four tool grinders, two men and two women.

J. Both Ganatsiou and Greemon had determined they would recommend elimination of tool grinder positions before tool maker positions because the tool makers' job was more complex and they would be more difficult to replace if and when there was a business upturn. Tool grinding was still required, but this could be accomplished by the tool makers. One tool maker would usually be assigned to the tool grinding job for a week, even though there may not be sufficient tool grinding work to keep him busy for the period of time he was assigned to the job. Tool makers were qualified to perform tool grinding work, but tool grinders were not qualified to perform tool making

work. Mr. Fletcher was asked for his recommendation. Fletcher recommended elimination of tool grinder positions before tool maker positions for the reasons stated above.

K. Fletcher had no authority to terminate or transfer anyone, but management solicited his recommendation through the chain of command. Both Ganatsiou and Greemon testified that they had already determined that the tool grinders should go first and would have overturned any other recommendation by Fletcher.

L. The recommendation of Fletcher, Greemon, Ganatsiou was sent back to the Plant Manager, Brosnohan, and in accordance with company policy (Plaintiff's Exhibit 39, p. 14) the two tool grinders with the least seniority, Orvis Riley, male, and Phoebe Summitt, female, were moved from the position of tool grinder to other positions in the plant.

M. In late March, the projections of future sales again dictated a reduction in positions and the same procedure was followed, resulting in the move of the two remaining tool grinders, the female Plaintiff, and William Costner, male, to other jobs in the plant.

N. The Plaintiff has produced no evidence to rebut any of the Defendant's articulated reasons for the transfer of the Plaintiff from her job as a tool grinder to one of machine operator.

O. The only competent evidence of any bias by anyone in management at the Defendant's facility was the Plaintiff's testimony that Fletcher in 1979 had told her he did not think women should be in the tool room. This clearly is not sufficient to support a finding that the Plaintiff was not transferred along with two men and another woman for good faith business necessity. To hold otherwise would require the Court to conclude that the entire management from the Plant Manager on down colluded to eliminate the jobs of two men and another female in order to fulfill their imagined motive and intent to exercise their bias against the Plaintiff because of her sex. This just plainly does not make any sense.

P. The Court finds that after considering all the evidence Plaintiff was not discriminated against because of her sex. Her transfer from tool grinding to another job was done in a neutral manner out of a manifest business necessity in order to retain as many employees as possible in view of the drastic reduction of projected sales.

## CONCLUSIONS OF LAW

(1) Title VII prohibits discrimination in employment because of an employee's sex.

(2) The well-known order and allocation of proof set forth in the seminal cases of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) are applicable to Plaintiff's claims under Title VII. *Burdine*, the more recent case, summarized the three stages of proof of such claims: the claimant must prove by a preponderance of the evidence a *prima facie* case of discrimination; if the claimant proves a *prima facie* case, the employer has the burden to articulate a legitimate nondiscriminatory reason for the employment decision in order to rebut the inference of discrimination raised by Plaintiff's *prima facie* claims; once the employer articulates the reason for the employment action, the claimant has the burden to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were but a pretext for discrimination. *Burdine, supra* at 253, 101 S.Ct. at 1093–94. At all times Plaintiff retains the ultimate burden of persuading the Court that she was the victim of intentional discrimination.

(3) In Title VII cases, such as the instant action, in which disparate treatment is the basis of Plaintiff's claim, Plaintiff must prove intentional discrimination. The trier of fact may rely on inferences rather than direct evidence of intentional discrimination, but discriminatory intent must be proved by a preponderance of the evidence whether direct, circumstantial, or otherwise. *Texas Department of Community Affairs v. Burdine, supra; Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). This Plaintiff has failed to do.

(4) In light of these principles, and pretermitting the issue of whether Plaintiff established a *prima facie* case of discrimination on the basis of sex, the Court finds as previously pointed out that Defendant offered substantial evidence that the *alleged* adverse employment action concerning Plaintiff was based upon legitimate non-discriminatory business considerations, and not pretextual as contended by Plaintiff, and therefore, the Court concludes that Defendant did not discriminate against Plaintiff on account of sex in violation of Title VII.

(5) Plaintiff should be denied all relief.

(6) Each party shall bear their own costs, including attorney's fees, in this litigation.

(7) Any finding of fact which is determined to be a conclusion of law is so deemed and any conclusion of law which is determined also to be a finding of fact is so deemed.

The Court will file an Order dismissing Plaintiff's claims with prejudice in accordance with these Findings of Fact and Conclusions of Law.