**Judith A. RADOVANIC, Plaintiff,**

v.

**CENTEX REAL ESTATE CORPORATION, doing business as John Crosland Company, Defendant.**

**No. C–C–90–157–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

June 18, 1991.

Louis L. Lesesne, Jr., Gillespie Lesesne & Connette, Charlotte, N.C., for plaintiff.

Roy H. Michaux, Jr., Perry, Patrick, Farmer & Michaux, P.A., Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, District Judge.

THIS MATTER was tried before the undersigned on May 21, 1991 without a jury in Charlotte, North Carolina. The complaint alleges that Defendant discharged Plaintiff based on her gender and her status as a pregnant woman in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff was represented by Mr. Louis L. Lesesne, Jr., Esquire of Lesesne & Connette, located in Charlotte, North Carolina. Defendant was represented by Mr. Roy H. Michaux, Jr., Esquire of Perry, Patrick, Farmer & Michaux, P.A., located in Charlotte, North Carolina. Having heard the witnesses, weighed the evidence, and considered the arguments made by counsel, the Court enters the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT.

(1) Plaintiff is a thirty-three (33) year old white female who resides in Mecklenburg County, North Carolina.

(2) Defendant is a non-resident corporation which does business in Mecklenburg County, North Carolina. Defendant is in the business of building residential housing. Employees of Defendant do not actually construct the houses. Rather, Defendant develops the subdivisions and provides a project superintendent for each house built. The superintendent is responsible for managing the sub-contractors who actually build the house.

(3) At all times relevant to this litigation, Defendant employed in excess of 15 employees and is an "employer" as defined by § 701(b) of Title VII, 42 U.S.C. § 2000e(b).

(4) Plaintiff was first employed by Defendant's predecessor in interest, John Crosland Company, in September, 1986 as a field clerk in its Single–Family Residential Construction Division. As a field clerk, Plaintiff was responsible for providing clerical support to the superintendents. Plaintiff would also assist superintendents in checking the sewer lines of a new subdivision, walking the lots where houses would be built, selecting the appropriate house for a given lot, and determining where the driveway would be located. On several occasions, Plaintiff filled in for superintendents that were out sick or on vacation.

Plaintiff's supervisor stated in a letter to her that she performed her duties as a field clerk with "skill and commitment". *See Plaintiff's Exhibit 22.* Moreover, the witnesses for Defendant testified that Plaintiff was viewed as a good employee during her time as a field clerk. From the record in this case, the Court finds Plaintiff performed her tasks as a field clerk in a professional and effective manner.

(5) In October, 1987, Defendant purchased its predecessor in interest, John Crosland Company. In November, 1988, Plaintiff was informed that due to a reorganization, her position as a field clerk was being eliminated. Defendant's Single–Family Construction Production Manager, Randy Luther, offered Plaintiff the opportunity to train as a project superintendent. Both Plaintiff and Defendant viewed the new position as a promotion for Plaintiff.

(6) Luther was aware when he offered Plaintiff the new position that she had no previous training, other than her position as a field clerk, in the construction industry. However, other superintendent trainees lacked previous construction experience when hired for that position.

(7) When hired as a superintendent trainee, Plaintiff's salary was increased from $8.37 per hour to $21,000.00 per year. *See Plaintiff's Exhibit 1.* Plaintiff was also guaranteed a minimum $2,000.00 per year bonus. *See Plaintiff's Exhibits 2 and 21.* One of Defendant's superintendents, Scott

Peterson, testified that trainees were guaranteed a minimum bonus despite performance. When the trainee was made a superintendent, the bonus was then tied to performance.

(8) Prior to being promoted, Plaintiff was given a $225.00 per month car allowance by Defendant. Superintendents were required to purchase pick-up trucks. Thus, superintendents were given at least a $300.00 per month truck allowance. Luther and Plaintiff discussed raising her vehicle allowance to $300.00 per month.

Both parties determined it advisable that Plaintiff delay in purchasing a truck until it became evident that she was making it as a superintendent trainee. Thus, Luther wrote a memo signed by himself and Plaintiff which provided that her current car allowance of $225.00 would stay in effect "until such time as all parties are comfortable", at which time the standard $300.00 truck allowance for superintendents would go in effect. *See Plaintiff's Exhibit 21.*

Although Luther testified at trial that the agreement did not mean that the truck allowance would go into effect only when Plaintiff was performing satisfactorily and making it as a trainee, the Court finds that the clear language of the agreement, which Luther drafted and signed, provided that Plaintiff would get the truck allowance when she was performing satisfactorily. Any ambiguity in the agreement must be construed in favor of Plaintiff, the non-drafting party. Accordingly, if Plaintiff received the truck allowance, it was reasonable for her to assume that she was performing satisfactorily and making it as a trainee.

(9) Plaintiff's first assignment as a superintendent trainee was to work with Jerry Wyles, a construction superintendent building "Spec. 2" houses. The highest quality and most expensive houses built by Defendant were called "Spec. 4 houses". Spec. 2 houses were the second least expensive houses built by Defendant.

(10) As part of her training, Plaintiff was to observe the sub-contractors building the houses, walk the houses, and assist Wyles in any manner he requested. The training program did not have a formal time period, although it sometimes lasted for one year. Some persons such as Scott Peterson completed the program in only three (3) months.

(11) Prior to February, 1989, Wyles gave to Plaintiff one house for her to work on by herself from the ground up. The foundation was already in and framing was starting when Wyles assigned the house to Plaintiff. Thereafter, the framing subcontractor incurred problems and Plaintiff was unable to give the sub-contractor direction on how to correct the problem. Wyles then supplied the sub-contractor with the needed direction. Wyles ultimately resumed responsibility from Plaintiff for the house. However, Wyles never formally talked to Plaintiff about resuming responsibility for the house. Moreover, at no time did Wyles criticize Plaintiff or indicate to her that he was dissatisfied with her performance. At most, Wyles only indicated to Plaintiff that she needed to study and develop basic construction skills, and to spend more time in the field as opposed to the construction trailer completing paper work.

(12) Although Wyles never performed a written or oral evaluation of Plaintiff, he shared negative information regarding Plaintiff's performance with Luther and Martin Kerr, an area construction manager for Defendant. No written documentation to substantiate these communications was introduced at trial.

(13) In order to check the accuracy of Wyles' negative reports about Plaintiff's performance, Luther, in February, 1989, assigned a task for Plaintiff to perform as a test of her abilities. A house that Defendant had built needed a garage door added. Luther directed Plaintiff to go to the house, determine what needed to be done, and make the arrangements with the sub-contractor for the work to be completed. Luther believed that the project should only take three (3) or four (4) days to complete.

After several weeks, Plaintiff had failed to get the work done. Luther then directed Wyles to complete the task, which he did in approximately one (1) day. Luther testi-

fied that the inability of Plaintiff to complete this task was indicative of a lack of initiative, problem solving skills, and basic construction skills—essential abilities needed by superintendents. Moreover, Luther testified that Plaintiff's failure to quickly respond to his directions as the manager of the entire division demonstrated poor judgment. In Luther's opinion, a conscientious trainee should have been eager to impress him by getting the job done in a prompt and effective manner.

(14) Kerr and Luther decided after the test to assign Plaintiff to Scott Peterson, one of the best superintendents employed by Defendant. Kerr believed it possible that the negative reports of Wyles were motivated by a personality conflict. Although some trainees were reassigned to different superintendents, such reassignments were not normal.

Peterson was responsible for building Spec. 4 houses. At the time of Plaintiff's reassignment, the sub-division Peterson was assigned to was behind schedule. Therefore, Plaintiff believed she was reassigned to help get the sub-division caught up and to expose her to higher quality houses. Plaintiff was not told that the reassignment was a result of negative reports by Wyles and her failure of Luther's test.

(15) Peterson gave Plaintiff little responsibility. He did not walk houses with Plaintiff, nor did he allow her much contact with sub-contractors, nor did he give her a house for her to work on alone.

(16) Peterson believed Plaintiff's basic construction skills such as grading and framing were seriously lacking. For example, when one house ran out of dry wall, Plaintiff was unable to estimate how much additional materials were needed to complete the job.

(17) On another occasion, a sub-contractor, Harvey Wyles, called Plaintiff to see if a house was ready for interior work to be done. Plaintiff informed him that the house was ready. When the sub-contractor arrived the next morning, the house was not ready and he had to leave without completing the work. However, Plaintiff

testified that Peterson was present when the call came from Harvey Wyles, and that she was informed by Peterson to tell him that the house was ready. Defendant did not present any evidence to contradict Plaintiff's testimony that Peterson was involved in this scenario. Moreover, several witnesses testified that it was not unusual for a sub-contractor to arrive at a house only to find that the house was not ready for his particular work to be done.

(18) Defendant also presented the testimony of Robert Teeter, a sub-contractor that performed punch-out work for Defendant, to support its contention that Plaintiff's performance was unsatisfactory. Teeter stated that he preferred working with Peterson over Plaintiff because she was unable sometimes to direct him how to fix a problem. However, Teeter also indicated that his preference for working with Peterson was a result of the fact that he had worked for several years with Peterson. Moreover, Teeter stated that it was not expected for Plaintiff, after only several months as a trainee, to have as much experience as himself or Peterson. Teeter also testified that Plaintiff had on several occasions, but not often, obtained the wrong materials for him. However, Teeter also testified that other superintendents had made the same mistake.

(19) Based on the testimony of Peterson, Harvey Wyles, and Teeter as summarized in paragraphs (16) through (18), the Court finds that Defendant's contention that the discharge of Plaintiff was based in part on inadequate construction skills is not meritorious. The Court finds instead that Defendant fully knew Plaintiff was inexperienced in the construction business when she was promoted. Plaintiff was in the process of obtaining the necessary skills to become a superintendent when she was discharged. The Court further finds that much of Plaintiff's inability in acquiring the requisite skills was a result of Wyles' and Peterson's failure to take an active and aggressive role in her training.

(20) During February, 1989 and May 15, 1989, Peterson regularly discussed with Kerr Plaintiff's poor performance. How-

ever, no written documentation of these discussions was introduced at trial. Moreover, neither Peterson nor Kerr told Plaintiff that she was not performing satisfactory. Kerr believed that negative input was inconsistent with Defendant's positive/coaching management approach. Peterson did tell Plaintiff that she needed to improve her basic construction skills by staying in the field longer, walking houses, observing sub-contractors, and asking questions.

(21) In March, 1989, Plaintiff purchased a pick-up truck after Wyles had repeatedly informed Plaintiff that the policy of Defendant required superintendents to drive such vehicles. Luther testified at trial that when he learned from Wyles in February, 1989 that Plaintiff was looking at trucks, he instructed Wyles to inform Plaintiff that she should hold off on purchasing the truck because he was concerned that she did not have what it took to make it as a superintendent. However, Wyles contradicted this testimony by testifying that Luther never gave him such instructions. In any event, neither Luther nor Wyles instructed Plaintiff not to purchase the truck. Moreover, Luther on April 10, 1989 authorized Plaintiff's vehicle allowance to be increased to $300.00 per month. *See Plaintiff's Exhibit 4.*

(22) The contention of Defendant that Plaintiff was not performing satisfactorily from November, 1988 until April, 1989 is contradicted by the increase of Plaintiff's vehicle allowance. The agreement signed by Luther provided that the vehicle allowance would not be increased until it was evident that Plaintiff was performing satisfactorily and was on her way to becoming a superintendent. The Court puts a great deal of weight on the agreement and the increase in the vehicle allowance because the facts contained therein are in writing whereas the discussions concerning Plaintiff's performance were not documented. Accordingly, the Court finds that while Plaintiff's performance might not have been superior or even above average, it nonetheless was not as deficient as Defendant would have the Court believe. Otherwise, Luther would not have authorized Plaintiff's vehicle allowance to be increased. The Court believes that the evidence presented at trial regarding the performance of Plaintiff from November, 1988 through April 15, 1989 does not support Defendant's contention that Plaintiff's performance was unsatisfactory.

(23) Defendant's contention that Plaintiff was not performing satisfactory is also contradicted by the March 10, 1989 letter of Kurt Goldsmith, a customer of Defendant. The letter to Defendant commends Scott Peterson and Plaintiff on the assistance they had been to him. The letter states:

> I want to emphasize that Scott and Judy had been doing an excellent job, and continued to do so even through this situation ... Scott and Judy should be commended for their work, and were at all times very professional, courteous and adherent to John Crosland Company policy as I understand them.

*See Plaintiff's Exhibit 23* at 2.

(24) Defendant cannot contend that Plaintiff's performance was deficient based on her attendance at work. In 1989, Plaintiff took no sick days. *See Plaintiff's Exhibit 2.* Plaintiff only took one (1) week of vacation during 1989. *Id.*

(25) In April, 1989, Peterson began to notice by observing the physical appearance of Plaintiff that she was pregnant. No evidence was presented by Defendant that Plaintiff's performance was negatively effected by her pregnancy. Nor was any evidence presented that pregnancy in general would affect a woman's ability to be a superintendent.

(26) On May 15, 1989, Kerr and Peterson met with Plaintiff to discuss her progress as a superintendent trainee. A memo prepared by Kerr was given to Plaintiff. *See Plaintiff's Exhibit 5.* The memo indicates that Plaintiff's training needed to focus on two (2) areas, knowledge and skill. In the area of knowledge, Kerr stated Plaintiff needed to develop an understanding of general construction practices with particular attention given to understanding framing and exterior trim. In the area of skill, Kerr stated that Plaintiff needed to im-

prove in the area of personal relationships with customers, sub-contractors, and fellow superintendents. Kerr then went on to state that the training had not yet prepared her to manage a project. Thus, the training period was indefinitely extended. A second meeting was scheduled for June 15, 1989.

(27) At no time during the meeting was Plaintiff told by Kerr that her job was in jeopardy, nor did the memo specifically state that Plaintiff's performance was unsatisfactory. Rather, Plaintiff believed that the meeting was a new aspect of the training program. Kerr, on the other hand, believed the meeting was a positive approach designed to encourage Plaintiff to improve her performance. Kerr thought that Plaintiff would interpret the memo as a direction to make substantial progress in the areas identified in the memo within the next thirty (30) days.

(28) During the meeting of May 15, 1989, Plaintiff for the first time notified Kerr and Peterson that she was pregnant. Plaintiff indicated that she would be on maternity leave in August, 1989.

(29) After the May 15, 1989 meeting, Plaintiff's job responsibilities did not change. However, Kerr and Peterson testified that Plaintiff's attitude became more negative and lackadaisical. Peterson believed that Plaintiff up until this point in time had tried to improve. However, after the meeting, she became increasingly withdrawn. Needless to say, Plaintiff's performance did not improve in the opinion of Kerr and Peterson. Kerr and Peterson continued to discuss Plaintiff's poor performance. Kerr in turn discussed Plaintiff with Luther, his immediate supervisor.

(30) Much of the information relied on by Kerr in evaluating Plaintiff's performance was inaccurate. In preparation for the May 15, 1989 meeting with Plaintiff, Kerr discussed Plaintiff with Peterson. During their conversation, Kerr made notes regarding Plaintiff. *See Plaintiff's Exhibit 8.* The notes list the following negative comments regarding Plaintiff:

(a) People skills—

(i) During May, 1989, two customers of Defendant, the Gannons and Goldsmiths, moved into houses constructed by Defendant. Peterson testified that these customers had no confidence in Plaintiff and specifically requested that he and not Plaintiff conduct the walk-through. Peterson discussed this information with Kerr. On cross examination, however, Peterson admitted that it was natural for a customer to want him to do the walk-through instead of Plaintiff because of his experience. Furthermore, the depositions of both customers, which were introduced at trial by stipulation in lieu of live testimony, indicate that Peterson was in error regarding this testimony. Both customers testified that they did not request that Plaintiff not conduct the walk-through of their house. *See Plaintiff's Exhibit 17* at 7 (deposition of Bonnie F. Goldsmith); *Plaintiff's Exhibit 18,* at 7 (deposition of Ellen Gannon).

(ii) The notes indicate that sub-contractors and hourly employees did not respect Plaintiff because of a lack of knowledge. At trial, however, Harvey Wyles and Robert Teeter testified that they did not expect Plaintiff as a new trainee to have more knowledge than themselves. Moreover, the only hourly employee that testified at trial, Ed Bjorgen, stated that Plaintiff appeared to be learning the job, that her attitude was not negative, and that she asked questions.

(b) Construction knowledge—

The notes state that Plaintiff had not demonstrated a good secure understanding of home building. The notes list as examples the drywall incident (*see par. 16, supra*), the problems with framing and grading, and the incident with Harvey Wyles (*see par. 17, supra*). As the Court has previously discussed (*see par. 19, supra*), the evidence at trial does not support Defendant's contention that Plaintiff was discharged in part for lack of construction skills.

(c) Attitude—

The notes indicate Plaintiff did not demonstrate pride in her projects and had a negative attitude. However, Peterson testified at trial that Plaintiff's attitude did

not become negative until after the May 15, 1989 meeting.

(d) The effect of the inaccurate information communicated by Peterson to Kerr had the effect of clouding Kerr's opinion of Plaintiff. Kerr at no time had any independent basis for the information listed above. The opinion of Luther in turn was also inaccurately clouded for his information regarding Plaintiff's performance came from Kerr and Peterson. Like Kerr, Luther had no independent knowledge, other than Plaintiff failing his garage door test, regarding her performance.

(31) On June 15, 1989, the second meeting was conducted by Kerr and Peterson with Plaintiff. The meeting was informal and only lasted several minutes. Plaintiff was unable to state with specificity any progress she had made since the last meeting. Kerr testified that Plaintiff's attitude was negative, and that she was withdrawn. To give Plaintiff another opportunity to demonstrate her commitment to improving, Kerr decided to assign all warranty work to Plaintiff effective July 1, 1989. *See Plaintiff's Exhibit 7.* At no time did Kerr or Peterson indicate to Plaintiff that her job was in jeopardy.

(32) From July 1, 1989 through July 19, 1989, four (4) or five (5) warranties became due. The warranty work required a representative of Defendant to walk through a newly purchased home with the customer and correct any problems. Because of scheduling problems with the customer, it was not unusual for a single warranty to take over one (1) month to complete. Therefore, Plaintiff only completed one (1) warranty prior to being terminated on July 19, 1989. She completed that warranty satisfactorily.

(33) In July, 1989, Bjorgen and Teeter both indicated to Peterson that Plaintiff had a long way to go if she was going to be a superintendent. However, both stated that it was not unusual for a trainee to need additional time to gain the necessary skills to become an effective superintendent.

(34) On July 19, 1989 (some 8½ months after Plaintiff was promoted to a superintendent trainee), Kerr informed Plaintiff that she was being terminated based on her lack of construction skills and a negative attitude. *See Plaintiff's Exhibit 9.* Initially, Plaintiff was not given any severance pay. *See id.* However, Plaintiff was later given three weeks pay plus the $500.00 quarterly bonus as severance pay. *See Plaintiff's Exhibits 10 and 11.*

(35) In response to a request from the Equal Employment Opportunity Commission (*see Plaintiff's Exhibit 12*), Defendant produced a termination policy. *See Plaintiff's Exhibit 14.* That policy requires that an employee be given a written warning signed by the employee prior to a termination for unsatisfactory behavior. *See id.* at II-7-6. Plaintiff was never given a written warning.

(36) At trial, however, Luther testified that the policy was mistakenly produced pursuant to the EEOC request. That policy has on the first page the letters "ADP". ADP is Defendant's check writing service. Luther testified that Defendant at no time adopted this termination policy. Apparently, the policy was only meant to be a sample termination policy for ADP customers. The actual termination policy of Defendant does not require a written warning. *See Defendant's Exhibit 6.*

(37) The Court finds that Defendant's Exhibit 6 is the actual termination policy of Defendant. Plaintiff's Exhibit 14 was mistakenly produced. Accordingly, Defendant did not violate its termination policy when it failed to give Plaintiff a written warning of termination.

(38) Plaintiff filed a complaint with the EEOC within 180 days after being terminated. Plaintiff initiated this action within 90 days after receiving a right to sue letter from the EEOC. Accordingly, all of the jurisdictional requirements were met by Plaintiff.

(39) As previously discussed, the Court finds that Defendant's assertion that Plaintiff was terminated for lack of construction skills is without merit. The Court further finds that Defendant's assertion that Plain-

tiff was terminated because of complaints from customers is without merit.

(40) The Court does find, however, that Defendant's assertion that Plaintiff did not have the needed behavior traits to be an effective superintendent is meritorious. The requisite behavior traits for an effective superintendent include:

1. Strong leader.
2. Good decision maker.
3. Independent but able to follow directions.
4. High energy level.
5. Intelligent.
6. Able to stand stress for long periods of time.
7. Able to supervise a large number of activities simultaneously.
8. Persistent.
9. Good communicator.
10. Able to negotiate and manage a budget.
11. Honest.
12. Good attitude.

*See Defendant's Exhibit 6.*

(41) The evidence at trial clearly indicated that Plaintiff lacked initiative. Instead of enthusiastically tackling problems on her own initiative, Plaintiff waited to be told what to do. Furthermore, Plaintiff failed to follow directions and lacked persistence when she did not carry out the task to have the garage door fixed as directed by Luther. Moreover, the Court observed at trial that Plaintiff did not appear to be a good communicator or have a high energy level. To the contrary, Plaintiff seemed lackadaisical, uninterested and withdrawn on the witness stand.

(42) The evidence at trial also demonstrated a marked change in Plaintiff's attitude after the May 15, 1989 meeting. Plaintiff became noticeably withdrawn and was not eager to improve in the areas suggested by Kerr. Although much of the information relied on by Kerr was inaccurate, Plaintiff's response was not to prove Kerr wrong by doing an excellent job. Rather, Plaintiff appeared to sulk and to give up.

(43) Moreover, before the meeting, Plaintiff had a positive attitude and was attempting to learn the skills needed to become a superintendent. After the meeting, Plaintiff's attitude was negative and she became withdrawn and uninterested.

(44) After eight (8) months as a trainee, Kerr testified that Plaintiff should have been able to take a task and "make it happen". Plaintiff was unable to problem solve. While a portion of this inability was due to her lack of construction skills, a larger portion was due to her failure to take initiative.

(45) Plaintiff failed to introduce evidence that she was treated differently than other employees of Plaintiff. To the contrary, Defendant introduced evidence showing that it had made another female a project superintendent during the same time period as Plaintiff's training. That person had the proper behavior traits to become an effective superintendent.

(46) As stated by Defendant's counsel during closing arguments, this case goes to whether Plaintiff had the ability and aptitude to be a superintendent. The Court has concluded that Plaintiff was on her way to acquiring the construction skills that would have given her the ability to perform the job. However, Plaintiff did not have the aptitude to be a superintendent. Defendant clearly believed its superintendents needed to be independent, aggressive and competent problem solvers. The superintendents also needed to demonstrate initiative in tackling the multitude of problems that arise at a construction site. Plaintiff lacked these traits, and was instead passive in her approach to her job. A superintendent, that has no direct supervision at the job site, cannot be passive.

(47) Plaintiff offered no direct evidence at trial that Defendant was motivated to discharge her because of her pregnancy. The only slight inference of improper motivation in discharging Plaintiff on the basis of gender or her pregnant condition was the timing of the discharge in that Plaintiff was terminated shortly after Kerr learned of her pregnancy. Defendant, however, offered credible evidence explaining the

timing issue. Defendant did not want to treat Plaintiff favorably or unfavorably based on her pregnancy. Therefore, Defendant opted to terminate her without consideration of the pregnancy. The Court finds as a matter of fact that this explanation is believable and credible.

(48) Based on all of the evidence, the Court concludes as a matter of fact that Plaintiff was not terminated by Defendant based on her gender or her status as a pregnant female. Although the evidence does not support Defendant's contention that Plaintiff was terminated for lack of construction skills or complaints from customers, the evidence does demonstrate that Plaintiff lacked the behavior traits to be an effective superintendent. What a person knows is not the only criteria needed to be effective in a given job; who a person is and the behavioral traits of that person also enters into the applicable qualifications for the job.

The Court does not conclude that Plaintiff is not a good person or that she was a bad employee. Rather, the Court finds that a good match did not exist between Plaintiff and the position of superintendent. And the fact that Plaintiff was a female and pregnant was of no significance in Defendant's decision to terminate her.

## II. CONCLUSIONS OF LAW.

(1) Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1) provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin ...

Accordingly, discrimination based on a persons' sex or gender is prohibited by Title VII.

(2) Section 701(k) of Title VII, 42 U.S.C. § 2000e(k) defines "because of sex" or "on the basis of sex" of Section 703(a)(1) to include discrimination based on "pregnan-cy, childbirth, or related medical conditions...." Discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex. *See International Union v. Johnson Controls, Inc.*, — U.S. —, 111 S.Ct. 1196, 1203, 113 L.Ed.2d 158 (1991); *Newport News Shipbuilding & Dry Dock, Co. v. EEOC*, 462 U.S. 669, 684, 103 S.Ct. 2622, 2631–32, 77 L.Ed.2d 89 (1983).

■ (3) Title VII does not provide that a person may not be discharged *if* she is a female. Rather, the law requires a Title VII plaintiff to prove by a preponderance of the evidence that she was discriminated against *because* she is a female. *See Grier v. Casey*, 643 F.Supp. 298, 308 (W.D.N.C.1986).

The language of Title VII indicates that Congress intended to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially (and gender based) stratified job environments to the disadvantage of minority citizens". *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). It is clear from the legislative history of Title VII that Congress did not intend to guarantee a job to every person regardless of qualifications. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). Congress intentionally eliminated from the final draft of Title VII language that would have permitted discharge of protected groups only "for cause". *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1784–85 & note 4, 104 L.Ed.2d 268 (1989). Thus, Congress intended to maintain an employer's freedom of choice in making employment decisions based on the individual characteristics and qualities of employees. *Id.*

■ (4) In a case such as the one presently before the Court where a plaintiff alleges that she was subjected to discriminatory disparate treatment, the plaintiff must prove intentional discrimination. *See Kelso v. Homelite*, 661 F.Supp. 477, 482

(W.D.N.C.1987). The employer's intent or motivation may be shown by inferences rather than direct evidence of intentional discrimination, but the evidence, whether direct, circumstantial, or otherwise must establish by a preponderance of the evidence the discriminatory intent and not simply that the employee was a member of a protected class. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *see also Grier*, 643 F.Supp. at 308.

■ (5) The United States Supreme Court has set forth the burdens and order of proof for a disparate treatment case. *See Price Waterhouse*, 109 S.Ct. at 1788; *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94.

■ (6) The burden of establishing a prima facie case of disparate treatment is not onerous. *Id.* at 253–54, 101 S.Ct. at 1093–94. The purpose of requiring a plaintiff to make a prima facie showing is to eliminate the most common nondiscriminatory reasons for the plaintiff's rejection. *Id.* at 254, 101 S.Ct. at 1094.

The standard for establishing a prima facie case is flexible. *See id.* at 254, note 7, 101 S.Ct. at 1094, note 7. In discharge cases, the Fourth Circuit has enunciated the following test:

(1) Plaintiff was a member of a protected group;

(2) Plaintiff was terminated;

(3) Plaintiff was qualified to remain in her position; and

(4) The position remained open to similarly qualified applicants after Plaintiff's dismissal.

*See McNairn v. Sullivan*, 929 F.2d 974, 979 (4th Cir.1991); *but cf. Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir. 1989) (stating for third prong of test that Plaintiff's "job performance was satisfactory").

■ (7) The Court believes that Plaintiff has carried her burden in establishing a prima facie case.

(a) It is undisputed that Plaintiff was a member of a protected group, and that she was terminated. Hence, the first and second prongs of the *McNairn* test are satisfied.

(b) As to the third prong of the test, the most common nondiscriminatory reason for discharge argued by Defendant at trial was that Plaintiff lacked construction skills. *See Findings of Fact*, at par. 16–18. However, the Court determined that this reason was not supported by the evidence. *See id.* at par. 19 and 39. While it is true that the Court has determined that Plaintiff lacked the behavior traits to be an effective superintendent (*see id.* at par. 40–48), the Court believes that Plaintiff has shown that she was minimally qualified to remain in her position when terminated, although the Court further believes that she would not have ultimately been successful as a superintendent. Accordingly, the Court believes that Plaintiff has satisfied the third prong of the test. *But see Moore v. City of Charlotte*, 754 F.2d 1100, 1106 (4th Cir.) (holding that plaintiff failed to prove a prima facie case of racial discrimination), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).

(c) Although no direct evidence of the fourth prong of the test was presented at trial, it does not appear from the record that Defendant eliminated the position of superintendent trainee after Plaintiff was terminated. Thus, the fourth prong of the test is satisfied.

(8) The burden the defendant carries once the plaintiff has made a prima facie showing is only an intermediate burden to produce evidence of a nondiscriminatory reason for the action. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. The burden of proof never shifts to the defendant. The ultimate burden of persuading the fact finder that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See id.* at 253, 101 S.Ct. at 1093–94.[1]

(9) Defendant has introduced convincing evidence that Plaintiff lacked the necessary behavior traits to be an effective superintendent. *See Findings of Fact*, at par. 40–48. An employer can legitimately emphasize interpersonal skills in employment decisions, as long as the employer does not sex stereotype. *See Price Waterhouse*, 109 S.Ct. at 1783 & 1791. On numerous occasions, the Fourth Circuit has upheld employment decisions based on the evaluation of subjective behavior traits.

(a) In *McNairn v. Sullivan*, 929 F.2d 974, 979 (4th Cir.1991), the Fourth Circuit upheld the district court's finding that the plaintiff was fired when her job performance and attitude failed to improve. The court found that it was proper for the employer to base the termination of the plaintiff on subjective criteria. *Id.* The court went on to state:

> "Title VII does not require that employment decisions be impeccable. It only frowns on employment decisions that are based on 'race, color, religion, sex, or national origin....' "

*Id.* at 980 (footnote omitted).

(b) In *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir.1989), the Fourth Circuit found that the trial court was correct in concluding that the defendant had articulated a nondiscriminatory reason for terminating the plaintiff. In particular, the district court held that the employer had met its burden of production in showing legitimate, nondiscriminatory reasons for the plaintiff's discharge. Those reasons included the subjective behavior traits of an insubordinate attitude and difficulty in working with fellow employees. In affirming the district court, the Fourth Circuit noted, "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action". *Id.* (citing *Gairola v. Commonwealth of Virginia Dept. of General Services*, 753 F.2d 1281, 1288 (4th Cir.1985)).

1. The once clear *Burdine/McDonnell Douglas* test has been clouded in mixed-motive gender discrimination cases by the recent *Price Waterhouse* case. *See Price Waterhouse*, 109 S.Ct. at 1806 (Kennedy, J., dissenting) (stating that plurality "manipulates existing and complex rules for employment discrimination cases in a way certain to result in confusion"). The plurality held that when a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken into account the plaintiff's gender. *Id.* at 1795.

Although the plurality attempted to harmonize its decision with the *Burdine* and *McDonnell Douglas* holding that the burden of proof in a Title VII case remains at all times with the plaintiff (*see id.* at 1788), the practical effect of requiring a defendant to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken into account the plaintiff's gender is tantamount to requiring the defendant to bear the burden of disproving discrimination. *Id.* at 1813 (Kenne-

dy, J., dissenting). This new proof scheme is bound to lead to confusion in lower courts and increased litigation by plaintiffs attempting to fit their particular case into the *Price Waterhouse* framework. *Id.* at 1812 (Kennedy, J., dissenting).

In the case at hand, it is not necessary to utilize the *Price Waterhouse* mix-motive, proof scheme. *Price Waterhouse* does not come into effect unless the plaintiff introduces *direct* evidence that an unlawful motive was a *substantial factor* actually relied upon in making the decision. *Id.* at 1795 & 1804–05 (White, J. & O'Connor, J., concurring). In *Price Waterhouse*, the defendant's partners on numerous occasions evaluated the plaintiff based on sex stereotypes. One partner suggested that the plaintiff take a course in a charm school, while another partner told the plaintiff that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry". *Id.* at 1782.

In this case, Plaintiff has introduced no direct evidence of discrimination. *See Findings of Fact*, at par. 45 & 47. Accordingly, *Price Waterhouse* is distinguishable from the case currently before the Court.

(c) In a case similar to the one at hand, the Fourth Circuit held that a termination of a female airline pilot was for a nondiscriminatory reason. *See Tingley v. Henson Aviation, Inc.*, 789 F.2d 275, 276 (4th Cir.1986). As in the case at hand, the evaluations the plaintiff in *Tingley* received were generally satisfactory. However, the employer believed that the plaintiff had difficulty in handling stressful or unusual situations. *Id.* This single factor was cited by the employer as the only reason the defendant was not promoted to captain, and ultimately terminated. Again, the Fourth Circuit upheld the utilization by the employer of subjective behavior traits in making the termination decision of the plaintiff.

(10) In this case, the Court believes that Defendant was justified in terminating Plaintiff based on the lack of necessary behavior traits to become an effective superintendent. This reason was legitimate and nondiscriminatory. Having met this burden of production, Plaintiff, in order to prevail, must demonstrate by a preponderance of the evidence that the stated nondiscriminatory reason was a pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94.

(11) Defendant has introduced substantial evidence that Plaintiff's behavior traits did not match the requirements for the position of a superintendent. Moreover, the Court had the opportunity at the trial to observe Plaintiff's demeanor and to assess whether there was a reasonable factual foundation for the evidence produced by Defendant. As previously noted, the Court's observations were consistent with the evidence.

Even if Defendant and the Court were mistaken regarding whether Plaintiff had the necessary behavior traits to be an effective superintendent, this fact alone would be of no import. This Court has stated on a previous occasion that:

> The Plaintiff cannot prove that the employer's reason for his discharge was pretextual merely by claiming that the employer's action was mistaken. The law is clear that an employer's reason for

his action may be a good reason, a bad reason, a mistaken reason, or no reason at all, as long as the decision was not based on race and/or sex or other unlawful discriminatory criteria. An employer is not required to prove that its decision was correct; the trier of fact need only determine that the defendant, in good faith believed the plaintiff's performance to be unsatisfactory and that the asserted reason for the action was not a mere pretext for discrimination.

*Grier*, 643 F.Supp. at 308–09 (citations omitted). In this case, Plaintiff has produced no evidence to show that Defendant manufactured the explanation that she lacked the necessary behavior traits to function as an effective superintendent. To the contrary, the evidence supports the reason as being factually accurate.

(12) As a final thought, the Court believes a brief discussion regarding the recent United States Supreme Court case of *International Union v. Johnson Controls, Inc.*, —— U.S. ——, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) is in order. In that case, the employer maintained a policy that restricted females that might become pregnant from certain manufacturing jobs for fear that unborn children might be exposed to dangerous chemical substances. In the case at hand, Plaintiff introduced no evidence that Defendant maintained a policy of excluding pregnant employees from certain types of job. Accordingly, the holding in *International Union* is distinguishable from the case at hand.

(13) Any finding of fact which is determined also to be a conclusion of law is so deemed and any conclusion of law which is determined also to be a finding of fact is so deemed.

## III. ORDER OF THE COURT.

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY, ORDERED, ADJUDGED, AND DECREED:

(1) That the Plaintiff's claims of discrimination are DISMISSED WITH PREJUDICE;

(2) Judgment will be entered simultaneously with this Order; and

(3) Each party shall bear her and its own costs.